FILED
APR 2 0 2006
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. CR-05-00610-DLJ |
| ) | |
| ANGELO TRENGALI, ) | **ORDER** |
| ) | |
| Defendant. ) | |
| _____ ) | |

On March 3 and March 24, 2006, the Court conducted an evidentiary hearing on Defendant's Motion to Suppress. Alicia W. Fenrick appeared on behalf of the Government; Marianne C. Rossi appeared for the Defendant. Having considered the testimony at the hearing, arguments of counsel, the papers submitted, and the applicable law, the Court hereby issues this Order in support of the Court's April 5, 2006 Order, which DENIED the Defendant's Motion to Suppress.

### I. BACKGROUND

Defendant Angelo Trengali is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

The Defendant seeks to suppress all evidence obtained from the July 16, 2005 search of his vehicle, including a fully loaded SM11 Mac-11 weapon, and all other evidence discovered and obtained in the investigation. The search was made after the Defendant was stopped in his vehicle by Officer Dan Cleghorn (Cleghorn) of the Livermore Police Department on the basis of two vehicle code violations - obstruction of the vehicle's license plate and failure to use a turn signal.

Officer Cleghorn testified to the following events at the March 3, 2006 evidentiary hearing.  In the early morning hours of July 16, 2005, he was assigned to a burglary suppression unit in the downtown area of Livermore.  The assignment encompassed patrolling the downtown area and looking for anything suspicious, due to recent burglaries that had occurred in the area.  Transcript of March 3, 2006 at 4:9-22.  Officer Cleghorn was driving an unmarked vehicle and wearing plain clothes.  At approximately 1:50 a.m., he spotted a vehicle in front of him that had mud on the body of the car, as well as on the license plate which obstructed the plate.  Id. at 5:11-22.  Cleghorn was approximately three car lengths from the vehicle and could not read the full license plate.  Id. at 6:6-11 & 14:19-25.

Cleghorn continued to follow the vehicle for several blocks, and then saw it turn into the parking lot of a restaurant without using the turn signal.  Id. at 6:13-7:4.  At this point Officer Cleghorn decided to stop the vehicle.  Id. at 7:5-12 & 26:6-11.

The vehicle pulled into a parking space at the restaurant, and Officer Cleghorn activated his emergency lights and siren in order to conduct a traffic stop of the vehicle in the parking lot.  Id. at 7:17-18.  Officer Cleghorn approached the vehicle, informed the driver of the reasons why he was being stopped, and asked him why there was mud all over the vehicle. Id. at 7:21-24.  The driver told Officer Cleghorn that his kids had been driving the vehicle earlier in the day and that they

2

had gotten mud all over the car. Id. at 8:1-3. Cleghorn considered this answer to be suspicious because in some spots the mud was still wet. Id. at 9:6, 11:11-13 & 18:10-25.

The driver handed over his license, and the name on the license was that of the Defendant, Angelo Trengali. Id. at 8:7-10. Cleghorn saw that the address on the license was in Oakland, and asked the Defendant why he was in Livermore at this time of night. Id. at 8:24-9:2. The Defendant replied that he was dropping off his girlfriend. Id. at 9:2.

Officer Cleghorn proceeded to call dispatch from his radio for any information about the Defendant and his car, and was told by dispatch that the Defendant's drivers license was suspended. Id. at 10:3-8 & 41:21-22. Cleghorn testified that he had seen another car, which was occupied, and also parked in the lot, and that around this time he either asked dispatch for a cover officer or that dispatch sent a cover officer because he changed his status from "traffic stop" to "suspicious vehicle." Id. at 29:13-21. Officer Jeffrey Seymour (Seymour), who was also assigned to the burglary suppression unit in downtown Livermore, arrived within a few minutes. Id. at 58:15-22 & Defendant's Exhibit (Def. Exh.) 1.

After learning that the Defendant was driving with a suspended license, Cleghorn asked the Defendant to step out of the vehicle and advised him that he had a suspended license. Id. at 10:10-15. Cleghorn had the Defendant walk to the back of the vehicle, patted him down for weapons, and had him take a seat on the curb next to the vehicle. Id. at 10:19-22.

3

At this point Cleghorn decided to tow the vehicle due to the fact that the Defendant was driving with a suspended license. Id. at 10:24-25. Cleghorn testified that according to Livermore Police Department policy, if a car is stopped and it is discovered that the driver is driving on a suspended license, it is routine procedure to impound the driver's vehicle. Id. at 19:7-13. There may be circumstances where a driver's license is suspended and officers decide not to impound the vehicle, such as where there is approval from a supervisor to do otherwise, or where it would be unsafe to impound the vehicle. Id. at 19:11-13 & Government's Exhibit (Govt. Exh.) B at 2.

Officer Cleghorn also testified that according to Livermore Police Department policy, officers conduct an inventory search of all vehicles before they are towed. Id. at 19:21-20:4 & Govt. Exh. B at 7-8. The purpose of this policy is to secure property, protect the police department from false claims and to protect persons from dangerous items located inside vehicles. Id. at 19:23-20:4, 22:14-23 & Govt. Exh. B at 8.

After making the decision to impound the Defendant's vehicle, Cleghorn asked the Defendant if there was anything illegal in the vehicle. Id. at 11:7-8. The Defendant hesitated and looked away, eventually replying "no." Id. at 11:8-9. Cleghorn handcuffed the Defendant and had him sit back down on the curb while he conducted the inventory search. Id. at 11:14-16.

4

Cleghorn proceeded to search the Defendant's vehicle, finding the following: a loaded SM11 Mac-11 semi-automatic weapon under a sweatshirt on the passenger seat with what appeared to be a silencer attached to the barrel of the weapon, and a canvas bag attached to the ejection port; a magazine inserted into the grip of the gun; two ski masks, one located in the center console and the other found in the driver side front pocket door; a pair of black leather gloves found on the driver's seat; and a tan canvas bag located in the trunk, which contained 2 two-way radios, two pairs of sunglasses, binoculars, a rental car receipt from Dollar Rent a Car in Defendant's name, and a photograph of a white GMC Yukon. Id. at 12:7-13 & Def. Exh. 2 at 6-7.

Officer Cleghorn testified that the Livermore Police Department does not have a standard practice regarding whether to do an inventory search before or after issuing a citation or making an arrest for driving with a suspended license. Id. at 21:4-20. In most cases, officers try to get the inventory search done while the tow truck is coming so that the tow operator does not have to wait. Id. at 21:12-14. Sometimes citations are not issued until after the tow truck is gone. Id. at 21:15-20.

In this case, Officer Cleghorn did the inventory search first. He testified that due to the circumstances that arose from the inventory search, specifically finding the weapon in the vehicle, he proceeded to arrest the Defendant for several weapons violations under California law and did not give the

1    Defendant a citation for driving with a suspended license.  Id.
2    at 20:15-21:3.
3         Officer Seymour testified to the following events at the
4    March 3, 2006 evidentiary hearing.  On July 16, 2005, he was
5    assigned to a burglary suppression unit in downtown Livermore.
6    Id. at 77:14-20.  Shortly after 1:50 a.m., police dispatch
7    advised him to respond to the area of the Celadon Restaurant to
8    cover Officer Cleghorn.  Id. at 78:2-12.  Officer Seymour
9    arrived at the restaurant parking lot at approximately 1:57
10   a.m.  Id. at 79:8-10 & Def. Exh. 1.
11        Upon his arrival, Officer Seymour walked up to the
12   passenger side of Officer Cleghorn's unmarked car.  Id. at
13   79:12-17.  Officer Cleghorn was standing at the driver's side
14   door of another vehicle.  Id. at 79:19-23.
15        Dispatch asked Officer Seymour to verify the stopped
16   vehicle's license plate, and in the process of providing that
17   information, Officer Seymour observed that the vehicle's rear
18   was covered in splatters of mud and that there was mud on the
19   rear license plate.  Id. at 80:21-81:17.  Officer Seymour could
20   read the rear plate from approximately 15 feet away, as he
21   stood next to Officer Cleghorn's car.  Id.  at 81:11-15.
22        Officer Cleghorn asked the Defendant to step out of his
23   vehicle, then patted him down for safety reasons and had him
24   sit down on the curb, with Seymour standing nearby.  Id. at
25   81:19-82:18.  Officer Seymour heard Cleghorn ask the Defendant
26   if there was anything illegal in the vehicle that he should be
27   aware of.  Id. at 84:5-6.  The Defendant did not answer the
28

first time, he just looked away. Id. at 84:6-8. Officer Seymour testified that at the time of these events, he felt the situation did not seem right - the Defendant was not being cooperative and the mud on the vehicle looked like it had been placed there because the tires were clean and the mud was still wet. Id. at 84:11-20.

Officer Cleghorn then had the Defendant stand up while he placed him in handcuffs. Id. at 84:8-9. Seymour testified that around this time he heard Cleghorn tell the Defendant that he was going to search the vehicle and tow it. Id. at 83:21-84:2. Cleghorn then proceeded to search the vehicle. Id. at 85:4-6. Officer Cleghorn found a weapon on the front passenger seat, at which point they called for another unit before completing the vehicle search. Id. at 85:11-24.

Officer Seymour stayed at the scene for another 15-20 minutes, during which time he completed the tow slip/CHP 180. Id. at 86:12-16 & Govt. Exh. C.

Defendant Trengali testified at the March 24, 2006 evidentiary hearing, and disputed two areas of the account of the events by the officers:

- The Defendant testified that the mud splatters on his vehicle where not obstructing the characters of the rear license plate.
- The Defendant testified that he used his turn signal when turning into the restaurant parking lot.

7

## II.  LEGAL STANDARDS

1. Vehicle/Traffic Stops

The Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops. United States v. Lopez-Soto, 205 F.3d 1101, 1104-05 (9th Cir. 2005). A law enforcement officer may conduct a traffic stop if there is reasonable suspicion to conclude that a traffic violation has occurred. United States v. Willis, 431 F.3d 709, 714-15 (9th Cir. 2005).

The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. Whren v. United States, 517 U.S. 806, 813 (1996). A stop is permissible so long as "the circumstances, viewed objectively, justify that action." Id.

2. Inventory Search Exception to Warrant Requirement

Law enforcement officers may conduct an inventory search of a lawfully impounded vehicle without a warrant. South Dakota v. Opperman, 428 U.S. 364, 369 (1976); see also United States v. Wanless, 882 F.2d 1459, 1463 (9th Cir. 1989); United States v. Feldman, 788 F.2d 544, 550 (9th Cir. 1986). The reasons for conducting the inventory search are threefold: (1) the protection of the vehicle's owner's property; (2) the protection of the police against claims by the owner; and (3) the protection of the police from potential danger. Wanless, 882 F.2d at 1463 (citing Opperman, 428 U.S. at 369).

The government must show that the inventory search was conducted in accordance with standard local police procedures. United States v. Johnson, 936 F.2d 1082, 1084 (9th Cir. 1991).

3. Exclusionary Rule and Fruit of the Poisonous Tree

The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of government misconduct to evidence derived from the illegal conduct, or "fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341 (1939).

The Supreme Court has developed three exceptions to the fruit of the poisonous tree doctrine which allow the admission of evidence derived from official misconduct - the independent source exception, the attenuated basis exception, and the inevitable discovery exception.

4. Inevitable Discovery Exception

The inevitable discovery exception allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through subsequent and foreseeable lawful conduct. Nix v. Williams, 467 U.S. 431, 444 (1984). This doctrine requires that the fact or likelihood that makes the discovery inevitable arises from circumstances other than those disclosed by the illegal search itself. United States v. Boatwright, 822 F.2d 862, 864-65 (9th Cir. 1987).

### III.  DISCUSSION

A.  Legality of Initial Vehicle/Traffic Stop

The Defendant argues that the initial stop of his vehicle was unlawful because there was neither probable cause nor reasonable suspicion for Officer Cleghorn to make the stop.

First, the Defendant maintains that his rear license plate fully complied with California Vehicle Code Section 5201, which requires that a license plate be clearly visible where mounted on the vehicle and that the plate be clearly legible. The Defendant testified at the March 24, 2006 evidentiary hearing that the mud splatters on his vehicle did not obstruct the characters of the rear license plate. Defendant also argues that photos of his vehicle and license plate, taken by the government at the time of his arrest, show that his vehicle was in compliance with Section 5201.

The government responds that Officer Cleghorn was unable to read the Defendant's license plate from approximately three car lengths away because mud was stuck on the surface of the plate. Cleghorn testified at the March 3, 2006 evidentiary hearing to this effect. The government further argues that even if the Defendant is correct that mud did not obstruct the license plate, a mere mistake of fact will not render a stop illegal if objective facts known to the officer reasonably support his factual conclusion. The government claims that it is undisputed that the Defendant was driving in a business area in the early hours of the morning, with mud covering his vehicle, and these facts reasonably support his conclusion that

10

1  the license plate was obstructed.

2  Defendant also maintains that he did not violate
3  California Vehicle Code Sections 22107 and 22108 by failing to
4  use a turn signal before turning right into a parking lot that
5  night. Defendant asserts that there were no other vehicles on
6  the roadway that could have been affected by his right turn,
7  including the vehicle Officer Cleghorn was driving, so he was
8  not required to use his signal under the Vehicle Code. In any
9  event, Defendant testified at the March 24, 2006 evidentiary
10 hearing that he used his turn signal when turning into the
11 restaurant parking lot.

12 The government responds that California Vehicle Code
13 Section 22107 requires that a signal be used "in the event any
14 other vehicle may be affected by the movement," and that
15 Officer Cleghorn was driving behind Defendant's vehicle and
16 could have been "affected by the movement" of Defendant's
17 vehicle. In any event, Cleghorn testified at the March 3, 2006
18 evidentiary hearing that the Defendant failed to use a turn
19 signal when turning into the restaurant's parking lot.

20 A law enforcement officer may conduct a traffic stop if
21 there is reasonable suspicion to conclude that a traffic
22 violation has occurred. United States v. Willis, 431 F.3d 709,
23 714-15 (9th Cir. 2005). Testimony from the March 3, 2006
24 evidentiary hearing establishes that Officer Cleghorn had
25 reasonable suspicion to conclude that one or more traffic
26 violations occurred during his observation of Defendant's
27 vehicle on the morning of July 16, 2005.

28                                    11

1    Officer Cleghorn and Officer Seymour both testified that
2 the vehicle's rear was covered in splatters of mud and that
3 there was mud on the rear license plate.  Photos of the license
4 plate, taken by the government at the time of the incident,
5 confirm that there was mud on portions of the plate.  Govt.
6 Exhs. A & D.  The condition of the plate supports a reasonable
7 conclusion that the characters on the plate can be made out
8 when one is near the plate, as well as a reasonable conclusion
9 that the characters on the plate are obstructed when one is
10 driving behind the plate at a distance of approximately three
11 car lengths.  These circumstances establish that Cleghorn had
12 at least a reasonable suspicion sufficient to effectuate the
13 traffic stop on the basis of an obstructed plate.
14    As to the turn signal, Cleghorn testified that the
15 Defendant failed to use his turn signal when required by law,
16 and the Defendant testified that he did use his turn signal and
17 argues that Officer Cleghorn's vehicle was not close enough to
18 require use of a turn signal.  The Court observed the testimony
19 and notes that Officer Cleghorn's statements on this issue were
20 consistent throughout the incident (reflected in his
21 communications with police dispatch, the Defendant, and Officer
22 Seymour on the morning of July 16, 2005); in the report he
23 wrote afterwards; and during his testimony at the March 3, 2006
24 evidentiary hearing.  On the other hand, the Court notes that
25 the testimony of Defendant Trengali, in particular as to what
26 he was doing that morning and how the mud got on his rental
27 car, is not credible.  The Court credits Officer Cleghorn's

1 testimony as reliable and finds that there was reasonable
2 suspicion for the traffic stop on the basis of the turn signal
3 violation.
4     Given these findings, and noting that either one of the
5 traffic violations in this case constituted grounds to stop
6 Defendant's vehicle, the Court concludes that the initial stop
7 of the Defendant's vehicle did not violate the Defendant's
8 constitutional rights.
9 B.    <u>Legality of Officer Cleghorn's Inventory Search</u>
10     Notwithstanding whether or not the initial traffic stop
11 was valid, the Defendant argues that the inventory search of
12 his vehicle was not authorized.  The inventory search was
13 premised upon Officer Cleghorn's decision to tow the
14 Defendant's vehicle upon learning that the Defendant's license
15 was suspended.  However, the Defendant maintains that he was
16 not served with notice of the license suspension, that Officer
17 Cleghorn knew of Defendant's lack of notice upon receiving
18 Defendant's driving record, and therefore he could not be
19 arrested for driving with a suspended license.
20     The government responds that whether or not Defendant
21 could have been arrested for driving with a suspended license
22 is irrelevant, because his car could have been towed regardless
23 of whether he was arrested.  The government argues that
24 California Vehicle Code Section 14602.6 makes clear that an
25 officer may remove and seize a vehicle when an individual is
26 driving with a suspended or revoked license, and that the
27 officer does not need to first arrest the person for driving

13

with a suspended license. Furthermore, California Vehicle Code Section 22651 provides for circumstances where a vehicle may be towed due to driving with a suspended license, although there has been no arrest of the driver for the suspended license violation.

It is the government's burden to show that the inventory search was conducted in accordance with standard local police procedures. United States v. Johnson, 936 F.2d 1082, 1084 (9th Cir. 1991). The evidence admitted at the March 3, 2006 evidentiary hearing establishes that this burden has been met.

Officer Cleghorn testified that he made the decision to tow the Defendant's vehicle due to the fact he was driving with a suspended license. Transcript at 10:24-25. Officer Cleghorn explained that the Defendant's license was suspended under suspension service code "H," which means that even though the suspended license notification is not acknowledged by signature, the driver is deemed to be aware of the suspension because a certified letter has been sent to the driver and not returned within a designated time period. Id. at 52:16-22. When the driver has notice of the license suspension, or notice can be presumed, it is the standard practice of the Livermore Police Department to tow and impound the driver's vehicle. Govt. Exh. B at 1.

Officer Cleghorn testified that even if Defendant's license had been suspended under code "A," which means that there is no presumption of notice or knowledge of the license suspension, the Defendant's vehicle would still be subject to

14

towing under Livermore Police Department Policy and California Vehicle Code Section 22651(p). <u>Transcript</u> at 73:9-74:19 & Govt. Exh. B at 1-2. Thus, no matter what code a license is suspended under, the driver's vehicle may be towed. <u>Id</u>. at 74:17-19.

Officer Cleghorn testified that according to Livermore Police Department policy, officers conduct an inventory search of all vehicles before they are towed. <u>Id</u>. at 19:21-20:4 & Govt. Exh. B at 7-8. He testified that the Livermore Police Department does not have a standard practice regarding whether to do an inventory search before or after issuing a citation or making an arrest for driving with a suspended license. <u>Id</u>. at 21:4-20. In this case, Officer Cleghorn did the inventory search first. Due to the circumstances that arose from the inventory search, specifically finding the weapon in the vehicle, Office Cleghorn proceeded to arrest the Defendant for weapons violations and did not give the Defendant a citation or make an arrest for driving with a suspended license. <u>Id</u>. at 20:15-21:3.

Given that Officer Cleghorn was proceeding according to standard practice when he made the decision to tow the Defendant's vehicle, and when he subsequently conducted the vehicle search, the Court concludes that Officer Cleghorn's search of the vehicle did not violate the Defendant's constitutional rights.

C.   <u>Inevitable Discovery</u>

Even if it can be argued that the search of Defendant's

15

vehicle cannot be justified as an inventory search, the evidence is subject to the inevitable discovery doctrine. For example, in United States v. Aguilar, 301 F. Supp. 2d 1263 (D.N.M. 2004), the Court held that even if the on-site post-arrest search of defendant's automobile was conducted for investigatory rather than administrative purposes, and thus could not be characterized as a valid inventory search, the weapon discovered as a result of the search was admissible under the inevitable discovery rule. In Aguilar, the defendant's vehicle was lawfully impounded after his arrest and would have been subject to a lawful inventory search at that point. Id. A similar situation exists in this case.

Officer Cleghorn exhibited a clear intention to tow the Defendant's vehicle for the suspended license violation before he searched it and arrested Defendant for weapons violations. Before searching the Defendant's vehicle, Officer Cleghorn informed the Defendant of the suspended license violation. Officer Cleghorn testified that he made the decision to impound the vehicle after having the Defendant step out of the vehicle and advising him that he had a suspended license. Id. at 10:10-25. Officer Seymour testified that before the vehicle search started, he heard Cleghorn tell the Defendant that he was going to search the vehicle and tow it. Id. at 83:21-84:2. The Defendant's vehicle clearly would have been subject to a lawful inventory search once towed and impounded. Thus, the evidence in the vehicle is subject to the inevitable discovery doctrine and admissible on this separate basis as well.

16

## IV. CONCLUSION

For the foregoing reasons, this Order is issued in support of the Court's April 5, 2006 Order, which DENIED the Defendant's Motion to Suppress.

IT IS SO ORDERED

Dated:     April 20, 2006

_____
D. Lowell Jensen
United States District Judge